## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHARMASTEM THERAPEUTICS, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>VIACELL, INC., a Delaware corporation, OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A., FEMPARTNERS, INC., a Delaware corporation and CARITAS ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC., a Massachusetts Nonprofit Corporation,<br><br>　　　　　Defendants. | Civil Action No. 04-CV-11673 RWZ |

### EXHIBIT 3
### Part 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RECEIVED
OCT 15 2004

| | | |
|---|---|---|
| VIACELL INC., | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 04-1335-GMS |
| v. | ) ) | |
| PHARMASTEM THERAPEUTICS, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |

## NOTICE OF AMENDED COMPLAINT PURSUANT TO LOCAL RULE 15.1

TO: Paul J. Andre, Esq.
Lisa Kobialka, Esq.
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025

Philip A. Rovner, Esq.
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Suite 600
Wilmington, DE 19801

Pharmastem Therapeutics, Inc.
c/o The Corporation Trust Company
Corporate Trust Center
1209 Orange Street
Wilmington, DE 19801

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 15(a), ViaCell, Inc. has filed contemporaneously herewith an Amended Complaint. A copy of the Amended Complaint is attached hereto as Exhibit A. A copy of the Amended Complaint marked to show changes from the Complaint is attached hereto as Exhibit B.

1

RLF1-2796879-1

*[signature]*

Jeffrey L. Moyer, Esq. (#3309)
Alyssa M. Schwartz (#4351)
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
On behalf of ViaCell, Inc.

*Of Counsel*:
Paul F. Ware, Jr., P.C.
John C. Englander, Esq.
James C. Rehnquist, Esq.
Elaine Herrmann Blais, Esq.
Christopher T. Holding, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
On behalf of ViaCell, Inc.

Dated: October 15, 2004

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VIACELL INC., CRYO-CELL INTERNATIONAL, INC. and CORCELL, INC. <br><br> Plaintiffs, <br><br> v. <br><br> PHARMASTEM THERAPEUTICS, INC., <br><br> Defendant. | Civil Action No. 04-1335-GMS <br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

### INTRODUCTION

1    This case involves an unlawful, anticompetitive, and deceptive campaign by defendant PharmaStem Therapeutics, Inc. ("PharmaStem") to unreasonably restrain trade in and to monopolize the market for private cord blood banking in the United States. Through a series of wrongful and exclusionary agreements and actions, PharmaStem is seeking to coerce a boycott by health care providers of plaintiffs ViaCell Inc. ("ViaCell"), Cryo-Cell International, Inc. ("Cryo-Cell"), CorCell, Inc. ("CorCell") and other providers of private cord blood banking services. PharmaStem's goal is to force private cord blood banks to accept unnecessary and overbroad licenses to certain PharmaStem patents, which would require the companies to pay royalties to PharmaStem even for non-infringing conduct. Unless stopped, the inevitable result of PharmaStem's conduct is that consumers – the families of newborn infants – will be improperly required to pay higher prices for private cord blood banking services. Further, many families are being, and will be, deprived of the once-in-a-lifetime opportunity to preserve cord blood as a result of PharmaStem's actions.

1

2.     PharmaStem's wrongful and anticompetitive campaign involves two steps First, PharmaStem has repeatedly and improperly asserted, and continues to assert, that <u>any</u> collection of cord blood by obstetricians or hospitals infringes its patents  That blanket assertion of infringement is demonstrably false, misleading, and objectively unreasonable, as PharmaStem itself knows  PharmaStem's patents are subject to significant limits. As a result, obstetricians and hospitals simply cannot incur liability under PharmaStem's patents merely by collecting umbilical cord blood  Nonetheless, PharmaStem has sued numerous hospital and doctors (not to mention private cord blood banks) for patent infringement. In addition, PharmaStem has repeatedly made false and misleading public statements about its patents  This Court has already ruled that statements by PharmaStem in this regard were false and misleading, and enjoined PharmaStem from making false and misleading statements to obstetricians in the future. In defiance of the Court's order, PharmaStem has sent letters to literally tens of thousands of doctors that contain inaccurate, false, and misleading assertions of patent infringement against the doctors related to private cord blood banking  This conduct itself is wrongful, exclusionary, and deceptive, and is part of PharmaStem's overall anticompetitive scheme.

3.     Second, after making its unsupportable infringement allegations and public misstatements, PharmaStem presented doctors or hospitals with what is called an "Amnesty Agreement." In these wrongful agreements, PharmaStem agrees to drop all charges and/or not to file suit if the doctor or hospital agrees to a complete boycott of any private cord blood bank that has not signed one of PharmaStem's wrongful licenses. The terms of these "Amnesty Agreements," and the boycotts they impose, are far broader than any legitimate right to exclude PharmaStem may have from its patents. For example, the "Amnesty Agreements" purport to

2

prohibit the mere collection of blood, but no claim of any PharmaStem patent is directly or indirectly infringed by mere collection. Thus, the "Amnesty Agreements" would prohibit doctors and hospitals from engaging in a broad array of <u>non-infringing</u> conduct. PharmaStem is actively working to execute such agreements with literally tens of thousands of doctors. The "Amnesty Agreements" are wrongful and anticompetitive, both on their own and as part of PharmaStem's overall anticompetitive scheme.

4.  PharmaStem has wrongfully coerced numerous hospitals and physicians into signing "Amnesty Agreements" and boycotting private cord blood banks that have refused to enter into PharmaStem's wrongful licenses. On information and belief, additional doctors and/or hospitals are signing and will sign PharmaStem's wrongful "Amnesty Agreements" rather than subject themselves to the costs and burdens of PharmaStem's wrongful tactics. The doctors are susceptible to PharmaStem's pressure tactics, because they generally have no vested interest in working with any particular blood bank. Some hospitals and obstetricians have simply ordered their staffs not to collect cord blood at all, regardless of which cord blood banks will be used, to avoid the risk of litigation with PharmaStem. This is adversely affecting patients' ability to collect and store cord blood – an opportunity that, once lost, can never be recovered.

5.  ViaCell, Cryo-Cell and CorCell are private cord blood banks that provide a range of services to customers. ViaCell, Cryo-Cell and CorCell have successfully defended against patent infringement claims by PharmaStem. This Court recently ruled that ViaCell, Cryo-Cell and CorCell do not infringe one of PharmaStem's patents (the '553 patent) as a matter of law, and it granted a new trial on infringement with respect to another of PharmaStem's patents (the '681 patent), while affirming the limitations on the '681 patent

3

PharmaStem's anticompetitive conduct directly targets ViaCell, Cryo-Cell and CorCell. Among other things, PharmaStem explicitly lists ViaCell, Cryo-Cell and CorCell in its "Amnesty Agreements" as entities to be boycotted.

6      In the past few weeks, obstetricians and hospitals have contacted ViaCell, Cryo-Cell and CorCell to state that they will no longer collect blood for patients to be stored with ViaCell, Cryo-Cell and CorCell. These effects are already irreparably harming the business of ViaCell, Cryo-Cell and CorCell. If PharmaStem's conduct continues unchecked, the situation threatens to get worse.

7.      PharmaStem's conduct is having a market-wide impact. At least 16 private cord blood banks allegedly have already signed license agreements with PharmaStem. As a consequence, companies have raised their prices because of the royalties they must pay to PharmaStem under the wrongful licenses. There are only four remaining private banks that have not succumbed to PharmaStem's tactics, and PharmaStem continues to target them aggressively with its unlawful conduct. Thus, consumers of private cord blood banking services are currently, or soon likely will be, paying more for those services than they would pay in the absence of PharmaStem's wrongful conduct.

8      ViaCell, Cryo-Cell and CorCell bring this action under the federal antitrust laws, 15 U.S.C. § 1 et seq., the federal Lanham Act, 15 U.S.C. § 1125 et seq., and various state laws. PharmaStem's conduct threatens to unreasonably restrain trade, and threatens to lead to a wrongful monopoly, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, unless PharmaStem is enjoined. ViaCell, Cryo-Cell and CorCell request that the Court grant a preliminary and a permanent injunction enjoining PharmaStem's ongoing anticompetitive conduct, including but not limited to preventing the enforcement of the so-called "Amnesty

4

Agreements," preventing PharmaStem from entering into any further such agreements, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and voiding the agreements already signed ViaCell, Cryo-Cell and CorCell also seek damages for the losses they have suffered from PharmaStem's wrongful, anticompetitive, and deceptive conduct in violation of Sections 1 and 2 of the Sherman Act under Section 4 of the Clayton Act, 15 U.S.C. § 15, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and in violation of state law

## PARTIES

9. Plaintiff ViaCell, Inc ("ViaCell") is a Delaware corporation with a principal place of business located 245 First Street, Cambridge, Massachusetts 02142.

10. ViaCell, through its subsidiary ViaCord, provides private blood banking services for families that wish to preserve umbilical cord blood units ("cord blood") following the birth of a child  If a family elects to do so, cord blood is collected at the time of birth by physicians. The blood is then transported to ViaCell for testing and storage. Because cord blood generally contains stem cells, cord blood can potentially be useful for treating certain diseases if they arise in the future. Different cord blood units contain differing amounts of stem cells. Depending on the amount of stem cells in a particular unit, it may or may not prove therapeutically useful

11. All of ViaCell's cord blood banking business is conducted through its facilities in Massachusetts. ViaCell's call center for cord blood banking is located in Massachusetts. Agreements between ViaCell and customers relating to cord blood banking are executed in Massachusetts, and those agreements contain a choice-of-law provision specifying that Massachusetts law governs.

12. Plaintiff Cryo-Cell is a Delaware corporation with its principal place of business at 3165 N. McMullen Booth Road, Clearwater, Florida 33761

13. Plaintiff CorCell is a Delaware corporation with its principal place of business located at 1411 Walnut Street, Philadelphia, Pennsylvania 19103. CorCell provides private blood banking services for families that wish to preserve umbilical cord blood units following the birth of a child.

14. Defendant PharmaStem Therapeutics, Inc ("PharmaStem") is a Delaware corporation with a principal place of business located in Larchmont, New York 10538.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over ViaCell's federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1 et seq., 15 U.S.C. § 1125 et seq., and of ViaCell's state-law claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22 as a district in which the defendant resides, may be found and/or transacts business.

## PHARMASTEM'S PATENTS AND THE PRIOR COMPETITOR LITIGATION

17. On information and belief, PharmaStem is the assignee of five patents relating to cord blood banking (collectively "PharmaStem's patents"). Those patents are U.S. Patent No. 5,004,681 (the "'681 Patent"), U.S. Patent No. 5,192,553 (the "'553 Patent"), U.S. Patent No. 6,461,645 (the "'645 Patent"), U.S. Patent No. 6,569,427 (the "'427 Patent"), and U.S. Patent No. 6,605,275 (the "'275 Patent").

18. Individually and collectively, PharmaStem's patents do not apply to the preservation of all cord blood or to all actions taken in connection with the collection and preservation of cord blood. Moreover, there is no objectively reasonable, good faith interpretation of PharmaStem's patents which suggests that those patents, individually and collectively, cover the preservation of all cord blood or all actions taken in connection with the

6

collection and preservation of cord blood. Thus, families, health care providers and blood banks can engage in numerous actions with regard to cord blood banking without infringing PharmaStem's patents. For example, no claim of any PharmaStem patent covers the mere collection of cord blood

19. Hospitals and/or physicians that collect cord blood, which a patient then provides to a private bank, do not infringe PharmaStem's patents. There is no direct infringement, because doctors and/or hospitals do not practice all of the claimed elements. There is no contributory infringement, because (among other things) neither hospitals nor doctors sell or offer to sell the cord blood. There is no inducement to infringe, because that requires evidence that the doctors or hospitals actively and knowingly aided and abetted another's direct infringement.

20. The context in which PharmaStem's current anticompetitive campaign must be understood includes a recent lawsuit PharmaStem commenced against all of the principal players in the private cord blood banking market. On or about February 22, 2002, PharmaStem filed a lawsuit against ViaCell, Cryo-Cell and CorCell and five other private cord blood banks, alleging infringement of the '553 Patent and the '681 Patent. *PharmaStem Therapeutics, Inc. v ViaCell, Inc. et al.*, Civil Action No. 02-148-GMS (D Del.) (Sleet, J.) (the "Competitor Litigation")

21. The private cord blood bank defendants in the Competitor Litigation denied liability and defended against PharmaStem's allegations on the grounds, *inter alia*, of non-infringement and that the patents were invalid and unenforceable.

22. On or about October 29, 2003, the jury in the Competitor Litigation returned a verdict in PharmaStem's favor

7

23. Following the jury verdict, the parties submitted several post-trial motions. The private cord blood bank defendants moved for, among other things, the entry of judgment of non-infringement as a matter of law or, in the alternative, a new trial

24. The Court in the Competitor Litigation issued a Memorandum and Order dated September 15, 2004 on the parties' post-trial motions. The Court granted judgment as a matter of law that the private cord blood banks do not infringe the '553 Patent, and granted a new trial on infringement of the '681 Patent. The Court also denied PharmaStem's motions, including its motion for entry of a permanent injunction

## PHARMASTEM'S ANTICOMPETITIVE CAMPAIGN TO COERCE A BOYCOTT OF PRIVATE CORD BLOOD BANKS

25. Prior to the Court's September 15 Order in the Competitor Litigation, PharmaStem embarked on its improper and anticompetitive scheme targeting hospitals and obstetricians. On information and belief, PharmaStem's purpose and intent was and is to choke off the supply of cord blood to the private cord blood banks that have resisted PharmaStem's efforts to force them to accept a wrongful and overbroad license. Through a variety of means, PharmaStem is bullying health care providers into a boycott of ViaCell, Cryo-Cell and CorCell. In this manner, PharmaStem is attempting to achieve through improper, unfair, deceptive, and anticompetitive practices the goal it is not entitled to achieve under its patents – forcing all private blood banks to accept licenses and pay royalties to PharmaStem in connection with <u>all</u> of their cord blood banking activities, whether or not those activities actually infringe PharmaStem's patents

26. On or about June 1, 2004, while the post-trial motions in the Competitor Litigation were still pending, PharmaStem began sending to obstetricians, and perhaps to others, letters substantially in the form attached hereto as Exhibit 1 ("the PharmaStem June

8

letter") The PharmaStem June letter contained numerous false and misleading statements concerning the Court's rulings to date, as well as the doctors' potential liability for infringement of PharmaStem's patents. The letter was sent to over 25,000 obstetricians.

27. By Order dated July 2, 2004, this Court (Sleet, J.) found that the PharmaStem June letter contained false and misleading statements. The Court also granted an injunction against further false or misleading communications directed to obstetricians. A copy of the Court's Order is attached hereto as Exhibit 2. In particular, Judge Sleet found, in pertinent part, that:

> 1. PharmaStem's June 1, 2004 letter to Obstetricians (the "PharmaStem Letter") contains false and misleading statements concerning this Court's rulings to date. In particular, the Court finds the following statements in this PharmaStem Letter false and misleading:
>
> A. "Patent infringement occurs when a person or institute practices all or part of a patented process." The Court finds this statement is misleading because it is black letter law that in order to prove contributory infringement of a method patent, the <u>entire</u> patented process must be performed. By suggesting that infringement would occur when only part of a process in performed, the letter is misleading.
>
> B. "In the case of umbilical cord blood collection by an obstetrician, the Court ruled that infringement occurs even if the cryopreservation and storage is performed by a third party." The Court finds this statement misleading for at least the following reasons. <u>First,</u> the sentence states that "the Court ruled" with respect to the "case" of "umbilical cord blood collection by an Obstetrician." This Court never made any rulings regarding conduct by obstetricians. There were no such allegations advanced in the trial of this matter. <u>Second</u>, the sentence leaves out several important elements that must be proved to show contributory infringement. The missing elements include:
>
>> 1. that there must be a <u>sale</u> or <u>offer to sell</u>, by the party that is accused of contributory infringement;
>>
>> 2. that the party accused of contributory infringement must be "acting in concert or working together"

9

with the other parties whose combined conduct performed each and every element of the patented process, and

3    that, under §271(c), a sale of a service, as opposed to a sale of a tangible physical object, is not sufficient to satisfy the requirements of the contributory infringement statute

The Court finds that without these elements, the statement is misleading

28. PharmaStem followed its June letter with a second wave of lawsuits, in each of which PharmaStem sued a private cord blood bank and one or more health care providers (individual physicians), group medical practices and a hospital, for patent infringement PharmaStem filed five such lawsuits, in locations throughout the country (the "Provider Lawsuits") Those lawsuit are.

(a)    *PharmaStem Therapeutics, Inc. v. Corcell, Inc., Molly McBride, M.D., and Carlo M. Croce, M.D.*, C A No 04-CV-3561 (E D Pa )

(b)    *PharmaStem Therapeutics, Inc. v. Cord Blood Registry, Inc. and Sutter Health, Inc.*, C A No 04-3072 (PVT) (N D Cal )

(c)    *PharmaStem Therapeutics, Inc. v. Cryo-Cell International, Inc. and Bruce Zafran, M D.*, C A No 8:04-CV-1740-T-30TGW (M D Fla )

(d)    *PharmaStem Therapeutics, Inc. v. Curesource, Inc., Monica Aszlerbaum, Andrew Cassidenti, Eunice U. Lee, Carla Wells, Anita York, Eliot Romero, Kathy Anderson, Nasrin Farbakhsh, Bruce A. Hagadorn, Rahasree T. Seshadri, Arthur Goldstein, and Charles W. Moniak*, SACV04-921 (GLT) (C D Cal )

(e)    *PharmaStem Therapeutics, Inc v. ViaCell, Inc., Obstetrical and Gynecological Associates, P A., Fempartners, Inc., and Caritas St. Elizabeth's Medical Center of Boston, Inc.*, C A No 04-11673 (RWZ) (D Mass )

29   On information and belief, PharmaStem deliberately filed the Provider Lawsuits in locations throughout the country to maximize the effect of those lawsuits in intimidating health care providers – including those not sued by PharmaStem – with the threat of patent litigation.

30   In each of the Provider Lawsuits, PharmaStem made a boilerplate allegation of infringement of the '427 patent against both the defendant private cord blood bank and at least one health care provider.

31.   On August 2, 2004, after PharmaStem filed the Provider Lawsuits, PharmaStem issued a press release ("August 2 Press Release"), a copy of which is attached hereto as Exhibit 3. The August 2 Press Release contained statements similar to those in the PharmaStem June Letter which the Court had found to be false and misleading. PharmaStem's press release was at odds with the July 2 injunction. PharmaStem caused copies of the Press Release to be mailed to thousands of obstetricians.

32   Shortly after initiating one of the Provider Lawsuits in the Central District of California against CureSource, Inc., and twelve physicians, PharmaStem sent a letter to the defendant physicians, offering to "settle" with them by agreeing not to enforce any of PharmaStem's five patents against them, provided the doctors would agree (1) not to collect cord blood or provide any service "in connection with" any of the private cord blood banks not licensed by PharmaStem, and (2) agree not to market or offer any service of the defendant cord blood banking companies. A copy of one of these letters, dated August 18, 2004, with the proposed agreement, is attached hereto as Exhibit 4.

33.   On or about August 20, 2004, PharmaStem began to send thousands of letters, again containing the same type of misleading statements, to physicians whom it had not sued

11

These letters informed the recipients of PharmaStem's "recent lawsuits filed across the United States against obstetricians who continue to collect cord blood or market services, including distribution of literature, for ViaCord, CBR (Cord Blood Registry), Cryo-Cell, Corcell and CureSource." PharmaStem also asserted.

> "It is PharmaStem's position, as asserted in the recent lawsuits, that <u>obstetricians are liable for patent infringement if they collect cord blood or market services for unlicensed cord blood banks</u>
>
> In an effort to avoid legal action from PharmaStem relating to its patents, please review and sign the attached Amnesty Agreement" (emphasis added)

A copy of one of these letters is attached hereto as Exhibit 5

34. Attached to these letters was a so-called "Amnesty Agreement," which PharmaStem insisted that the doctors sign to avoid legal action by PharmaStem. As in the case of the August 18, 2004 letter, the Amnesty Agreement required the physicians to agree "not to collect cord blood or market or offer the service of cord blood collection in connection with the unlicensed cord blood banks listed below." A copy of an "Amnesty Agreement" is attached hereto as Exhibit 6. None of PharmaStem's patents could support such a broad and sweeping restriction on the activities of doctors.

35. On or about September 14, 2004, PharmaStem sent another letter to obstetricians. This letter purported to be a settlement communication, but actually was a thinly-veiled attempt to bully and threaten obstetricians into joining PharmaStem's boycott. In this letter, PharmaStem threatened the doctors it had sued with "considerable time, expense, intrusion, and other inevitable tangible and intangible costs" if the doctors refused to settle. As with PharmaStem's other letters, this letter conditioned settlement on the doctors' agreeing to the same overbroad requirement "to collect <u>only</u> for one of the many cord blood banks already

12

operating under a license from PharmaStem " (emphasis added) A sample of this communication is attached hereto as Exhibit 7.

36. PharmaStem issued another misleading press release on or about September 20, 2004, after the Court in the Competitor Litigation issued its Order finding no infringement of the '553 Patent and granting a new trial on infringement of the '681 Patent. The September 20 Press Release mischaracterizes the Court's ruling as well as defendants' positions in the Competitor Litigation. For example, PharmaStem states that defendants argued that families who bank blood with them could be liable for infringement and that the Court "agreed with the defendants" in that regard. In fact, the basis for the Court's decision was that the defendants did not sell or offer to sell cord blood. Defendants in the Competitor Litigation did not argue that families are liable for infringing PharmaStem's patents, parents do not sell or offer to sell cord blood, and therefore cannot be liable. This is but the latest false implication designed to deter patients from seeking services from ViaCell, Cryo-Cell, CorCell and other private banks without regard to the narrow limitations of PharmaStem's patents. A copy of the press release is attached hereto as Exhibit 8.

37. On September 22, 2004, PharmaStem (through its counsel) sent a communication to the American College of Obstetricians and Gynecologists ("ACOG"). According to its website, the ACOG has over 46,000 members and is "the nation's leading group of professionals providing health care for women." The communication states, among other things, that "PharmaStem has filed patent infringement lawsuit against over two dozen physicians who work with the four unlicensed cord blood banks", that the "PharmaStem Amnesty Program has been joined by hundreds of physicians", and that another professional society "has recommended its members join the Amnesty Program as a precautionary measure

13

against being named as a defendant in a lawsuit " A copy of this communication is attached as Exhibit 9.

38     The Press Release of August 2, 2004, the letters of August 18, August 20, and September 14, 2004, the Press Release of September 20, 2004, and the communication of September 22, 2004 to the ACOG, were disseminated after PharmaStem had already made misrepresentations in the earlier PharmaStem June Letter  As such, they served to confirm and bolster the earlier misrepresentations and to perpetuate and reinforce false impressions about the scope of PharmaStem's patents and the risk of liability in the eyes of obstetricians, other health care providers and the public  The press releases, the letters, and the ACOG communication made no attempt to correct the earlier misrepresentations, to disclose the inaccuracies of the earlier misrepresentations, to accurately disclose the ruling of the Court in the Competitor Litigation, or to accurately describe the scope and limitations of PharmaStem's patents.  In the Settlement Agreement, the Amnesty Agreement and the cover letters accompanying them PharmaStem failed to disclose the limitations on theories of indirect infringement that Judge Sleet ordered were necessary to avoid deception.

39.    Even after reversal of the jury verdicts of infringement, PharmaStem continues to display a statement prominently on its website stating. "On October 29, 2003, a Delaware jury unanimously found that    ViaCord, CBR (Cord Blood Registry), Cryo-Cell and CorCell had willfully infringed [the '681 and '553] patents." This web page makes no reference to the fact that the Court subsequently overturned those verdicts, and is thus misleading  PharmaStem has refused a request to stop running statements concerning the overturned jury verdict  A printout from the web page dated October 5, 2004, is attached hereto as Exhibit 10

14

40      Concurrently with this campaign of deception and intimidation, PharmaStem purchased "sponsored links" on Internet search engines, such as Google and Yahoo, in which it identifies ViaCell, Cryo-Cell and CorCell as "unlicensed bank[s]," without direct reference to PharmaStem's patents, and states. "Why Take a Risk?" This advertisement and unauthorized use of ViaCell's, Cryo-Cell's and CorCell's trademarks is designed to, and does, create the misleading impression that ViaCell, Cryo-Cell and CorCell are cord blood banks that are not licensed, for example, by state health departments and, consequently, that they are in imminent danger of being shut down  In fact, ViaCell, Cryo-Cell and CorCell hold all state licenses required to operate a private umbilical cord blood banking service  This conduct constitutes disparagement and unfair and deceptive trade practices

41      The campaign of deception and intimidation undertaken by PharmaStem was intended to create misapprehension in the minds of physicians that they risk potential liability for infringement of the PharmaStem Patents even if they merely collect umbilical cord blood for a patient who is a customer of ViaCell, Cryo-Cell or CorCell  PharmaStem's actions also were designed to dissuade or prevent consumers from purchasing the services the cord blood banks that have not bowed to PharmaStem's extortionate tactics

42.     Under no proper interpretation of any claim of the PharmaStem Patents would an obstetrician be liable for patent infringement based merely on collecting umbilical cord blood at the time of a delivery and providing it to the patient for the patient's shipment to a private cord blood bank  PharmaStem does not hold a good faith belief that such conduct by physicians could provide a basis for infringement liability

43      Indeed, such improper threats, based upon such a clearly erroneous interpretation of the statute, of such enforcement constitute a misuse of the PharmaStem Patents  This

conduct also constitutes an improper and anticompetitive attempt to use PharmaStem's patents to cover unpatented activities

## THE THREATENED AND ACTUAL ANTICOMPETITIVE EFFECTS OF PHARMASTEM'S CONDUCT

44.     PharmaStem's campaign to coerce a boycott by health care providers against ViaCell, Cryo-Cell, CorCell and other private cord blood banks through the Amnesty Agreements threatens to unreasonably restrain trade in the market for private cord blood banking services  The boycott is intended to coerce, and unless enjoined threatens to have the effect of coercing, all or substantially all private cord blood banks into signing licenses with PharmaStem.  Those licenses are wrongful, overbroad, and anticompetitive, because they require blood banks to pay royalties to PharmaStem for activities that do not infringe PharmaStem's patents.

45.     The Amnesty Agreements that PharmaStem is using to implement its boycott also are improper and anticompetitive  Those agreements, individually and collectively, are designed and intended to deprive consumers of access to private cord blood banks where they do not have to pay an improper overcharge caused by PharmaStem's wrongful licenses  The terms of those agreements are far broader than is necessary to settle any legitimate claims for patent infringement PharmaStem may have against any hospitals or physicians  The overbreadth of those agreements serves no legitimate business purpose of PharmaStem and unduly restricts competition

46.     PharmaStem's Amnesty Agreements require the signing physician or hospital to "agree[] not to [1] collect cord blood or [2] market or [3] offer the service of cord blood collection in connection with the unlicensed cord blood banks listed below"  The Amnesty

16