## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
          IN AND FOR THE DISTRICT OF DELAWARE

                           - - -

PHARMASTEM THERAPEUTICS,      :   Civil Action
INC.,                         :
                              :
         Plaintiff,           :
                              :
     v.                       :
                              :
VIACELL, INC., CRYO-CELL      :
INTERNATIONAL, INC., CORCELL, :
INC., STEMCYTE, INC., CBR     :
SYSTEMS, INC., f/k/a CORD BLOOD :
REGISTRY, INC., BIRTHCELLS    :
TECHNOLOGY, INC., NUSTEM      :
TECHNOLOGIES, INC., and       :
BIO-CELL, INC.,               :
                              :
         Defendants.          :   No. 02-148-GMS

                           - - -

VIACELL, INC., CRYO-CELL      :   Civil Action
INTERNATIONAL, INC. and       :
CORCELL, INC.,                :
                              :
         Plaintiffs,          :
                              :
     v.                       :
                              :
PHARMASTEM THERAPEUTICS,      :
INC.,                         :
                              :
         Defendants.          :   No. 04-1335-GMS

                           - - -

              Wilmington, Delaware
           Wednesday, November 3, 2004
                    10:00 a.m.

                           - - -

BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J.
```

## Page 2

APPEARANCES:

    PHILIP A. ROVNER, ESQ.
    Potter Anderson & Corroon LLP
        -and-
    PAUL J. ANDRE, ESQ.
    Perkins Coie LLP
    (Menlo Park, California)

        Counsel for Plaintiff

    JEFFREY L. MOYER, ESQ.
    Richards, Layton & Finger
        -and-
    PAUL F. WARE, ESQ.,
    JOHN ENGLANDER, ESQ.,
    CHRIS HOLDING, ESQ., and
    ELAINE BLAIS, ESQ.
    Goodwin Procter LLP
    (Boston, MA)

        Counsel for ViaCell

    RICHARD D. KIRK, ESQ.
    Morris, James, Hitchens, & Williams LLP
        -and-
    WILLIAM F. ABRAMS, ESQ., and
    THOMAS CHAFFIN, ESQ.
    Pillsbury Winthrop LLP
    (Palo Alto, California)

        Counsel for CBR Systems, Inc.
        F/k/a Cord Blood Registry, Inc.

    JAMES J. RODGERS, ESQ., and
    EVELYN H. McCONATHY, ESQ.
    Dilworth Paxson LLP
    (Philadelphia, PA)

        Counsel for Defendant CorCell, Inc.

        - - -

## Page 3

INDEX

Preliminaries ---------------------- Page 5

Opening Remarks, Mr. Ware -------- Page 13

WITNESS

NICHOLAS S. DIDIER

    Direct examination ---------------- Page 16
    Cross-examination ----------------- Page 75
    Redirect examination -------------- Page 94
    Recross-examination --------------- Page 101

SUSAN CHRISTOPHER

    Direct examination ---------------- Page 104
    Cross-examination ----------------- Page 110
    Redirect examination -------------- Page 116

Argument, Mr. Ware ---------------- Page 130

Reply, Mr. Andre ------------------ Page 148

Response, Mr. Ware ---------------- Page 162

CONTEMPT ARGUMENT

Argument, Mr. Englander ---------- Page 168

Reply, Mr. Andre ------------------ Page 183

Response, Mr. Englander ---------- Page 203

PHARMASTEM'S MOTION

Argument, Mr. Andre -------------- Page 207

Reply, Mr. Englander ------------- Page 233

Mr. Rodgers ---------------------- Page 244

Mr. Abrams ----------------------- Page 245

Reply, Mr. Andre ----------------- Page 246

## Page 4

EXHIBITS

1, 2, 4, 5
5A, 5B, 5C,
7, 7A, 13,
15, 15A, 15B,
15C, 17, 18
18A, 20, 21        Page 119

| No. | Description | Page |
|-----|-------------|------|
| 22 | Amnesty Agreement Forms | Page 74 |
| 23 | Set of Amnesty Agreements | Page 74 |
| 24 | Face Page of Mailing List | Page 75 |
| 26 | Affidavit of Eric Gould | Page 118 |
| 25 | Affidavit of Chris Adams | |

        - - -

Page 5

1   THE COURT: Good morning, counsel. Please be
2   seated.
3       (Counsel respond "Good morning.")
4       THE COURT: We have all spent a considerable
5   amount of time together in the past. Why don't we for the
6   record begin with introductions. Mr. Rovner, with Mr.
7   Andre?
8       MR. ROVNER: Philip Rovner from Potter Anderson
9   for PharmaStem. With me is Paul Andre from Perkins Coie.
10      THE COURT: Welcome back.
11      Mr. Moyer.
12      MR. MOYER: Good morning, Your Honor. Jeff Moyer
13  on behalf of ViaCell. This morning we have Paul Ware, John
14  Englander, Chris Holding, as well as Elaine Blais from the
15  Goodwin Procter firm in Boston, for ViaCell.
16      MR. KIRK: Good morning, Your Honor. Richard
17  Kirk from Morris James Hitchens & Williams for CBR Systems.
18  With me are Bill Abrams and Tom Chaffin from Pillsbury
19  Winthrop.
20      MR. RODGERS: James Rodgers from Dilworth Paxson
21  for Cryo-Cell and CorCell. With me is Evelyn McConathy.
22      THE COURT: The Court would note the absence of
23  James Rehnquist and ask that, Mr. Ware and Mr. Englander, you
24  convey the Court's best wishes to him.
25      We have, I think, allotted several hours. We

Page 6

1   were going to go until 12:30 this morning, or this afternoon,
2   take an hour for lunch, then come back and go for another
3   hour or thereabouts. I have a 3:00 matter that I need to
4   attend. So if we are going to go beyond the allotted time, I
5   am going to need to take a break at 3. I hope we don't have
6   to go beyond the allotted time. Other than the 3:00 -- it is
7   a pre-Markman discussion, which shouldn't take a terribly
8   long period of time -- we would have additional time in the
9   afternoon if necessary.
10      As I understand, I want to make sure we have
11  agreement from everyone, we are here to consider three
12  separate motions. They are plaintiff's motion for the
13  issuance of a preliminary injunction in the underlying, I
14  will call it the underlying case, the 1335 matter, and
15  defendants' collective motions for contempt and for the
16  issuance -- and in the underlying case and in the new matter,
17  the 148 case -- I am sorry, the 1335 case -- I think I messed
18  up the numbers, on the issuance of a preliminary injunction.
19      If counsel have a different view, I am perfectly
20  prepared to hear it. But it strikes me that it may make
21  sense from a presentation point of view to take up the
22  defendants' two motions first, and then it seems like there
23  probably is going to be some necessary overlap. It does seem
24  like there may be a need to take these matters under
25  consideration separately. Is there a view out there to the

Page 7

1   contrary?
2       MR. ANDRE: Mr. Ware and I spoke before Your
3   Honor came out. Both obviously wanted to go first. Mr. Ware
4   brought out the issue that he had a witness that he would
5   like to get out of the courtroom. We would still obviously
6   like to go first. If it makes more sense to Your Honor, we
7   can go after they go.
8       THE COURT: That is sort of the way I have been
9   thinking about it. That is not to reflect the Court's view
10  one way or the other regarding the merits. That's just the
11  process of consideration. I think that's the way we will
12  proceed.
13      I do have a question for both sides. That is
14  how, if at all, once they are fully briefed, the defendants'
15  collective motions for partial reconsideration should play
16  into the Court's deliberations on all of the motions, quite
17  frankly?
18      MR. ENGLANDER: Your Honor, I believe they are
19  fully briefed at this point.
20      MR. RODGERS: That's correct.
21      THE COURT: There has been opening, answering and
22  reply?
23      MR. ROVNER: Yes, there has.
24      MR. ENGLANDER: Your Honor is quite right. I
25  think those issues do play into the questions of their motion

Page 8

1   for preliminary injunction, in the sense that they are up
2   here arguing for a likelihood of success. I think Your Honor
3   will recognize, that is not the thrust of our opposition.
4   But surely, if Your Honor were to grant that motion for
5   reconsideration, that would be the end of the likelihood of
6   success on the merits, because there would then be a JMOL on
7   the '681, and in that event they would have no argument for
8   likelihood of success on the merits on their motion for
9   preliminary injunction.
10      So there is relevance to it, and I intended to
11  touch on it.
12      THE COURT: Mr. Andre.
13      MR. ANDRE: I don't disagree with Mr. Englander.
14  I would like to add that there is a motion that is not fully
15  briefed that will also have impact on the plaintiff in the
16  ViaCell v. PharmaStem matter for their preliminary
17  injunction. That is a motion to dismiss that has been filed
18  in this Court, asking to dismiss their complaint altogether
19  based on various theories of compulsory counterclaims
20  elsewhere and the fact that there are cases pending that have
21  the exact same counterclaims in a couple other courts. So
22  there is a motion to dismiss. I think that needs to be fully
23  briefed and considered for their PI as well.
24      THE COURT: I don't disagree with that. Except I
25  have a view that that motion may be rendered moot at some

Page 9

1  point, only because, I will reference back to previous
2  teleconferences we have had and comments that the Court has
3  made to both sides with regard to the MDL process and the
4  views of other judges.
5       MR. ANDRE: I agree, Your Honor. Obviously, with
6  the MDL, if there is a consolidation, and it may be in this
7  Court, who knows what the MDL panel would due, that would be
8  for discovery matters and not trial, we believe if there is a
9  trial that goes forward in these matters that the claims that
10 are brought in this Court as the original complaint should be
11 counterclaims and should be tried to the extent they are
12 ripe, et cetera, under Article III, they should be tried in
13 the courts where the patent issues are being decided and
14 tried as well.
15      So it's just something that, for us to have to
16 defend the counterclaims, or the claims in this case, and
17 identical counterclaims elsewhere, or where they should have
18 been brought, that kind of gives us a chance to have
19 inconsistent verdicts. That, plus the fact when you see the
20 briefing fully briefed out, as to the merits of the
21 compulsory counterclaims, et cetera, I think that will have
22 the impact on the preliminary injunction that they seek.
23      I understand what Your Honor is saying with the
24 MDL.
25      THE COURT: What is your view, Mr. Englander, of

Page 10

1  the MDL and where that could potentially land us?
2       MR. ENGLANDER: We believe the MDL should take
3  place, and in that event all of these issues are going to be
4  before the Court.
5       THE COURT: For discovery only?
6       MR. ENGLANDER: But also for the decision of any
7  pretrial motions, Your Honor, which is what this is. We are
8  also prepared, in the context of our motion, to address the
9  issue of whether these are compulsory counterclaims, because
10 there is Supreme Court precedent that says there are not, as
11 well as cases since then.
12      I was perhaps a little tentative about the motion
13 for reconsideration. It surely is relevant to their motion
14 for preliminary injunction. And if Your Honor would like to
15 hear argument on that, we are prepared to give it, because it
16 is -- to the extent they are arguing likelihood of success,
17 one of our points is, they didn't prove it at trial and they
18 aren't proving it now. That is the point we have made in our
19 motion for reconsideration. And if Your Honor is willing to
20 hear it -- and I was tentative in part because Your Honor set
21 only the three matters for hearing -- it seems this issue is
22 squarely raised by their motion, and we would be happy to
23 present argument on their position today.
24      THE COURT: Are you prepared to argue?
25      MR. ANDRE: I am not prepared for that, Your

Page 11

1  Honor. We don't have the papers in front of us. And it was
2  something that just wasn't on our docket for today.
3       THE COURT: Even though I have not read the
4  briefs because, in point of fact, I didn't know it had been
5  fully briefed, I have retained enough familiarity based upon
6  having presided and now having digested the papers that sit
7  in front of me that I would be able to entertain argument.
8       But I don't want to put plaintiff at a
9  disadvantage. We may get on the phone and talk about it. I
10 am not going to make you come back to Delaware just for that
11 argument, unless after reading the briefs and considering
12 what we are going to do today I believe that it is of such
13 moment that it might require further explication and
14 discussion by way of oral argument in person. I will just
15 leave that there.
16      MR. ENGLANDER: Thank you, Your Honor.
17      THE COURT: Lastly, before we start, plaintiff
18 has filed with the Court Docket Item 30, PharmaStem
19 Therapeutics, Inc.'s request for judicial notice of relevant
20 exhibits thereof.
21      Are these for the purposes of today?
22      MR. ANDRE: Your Honor --
23      THE COURT: It is essentially, I think, a request
24 to have the Court judicially notice about an inch and a
25 half --

Page 12

1       MR. ANDRE: I believe that is for the motion to
2  dismiss.
3       MR. ROVNER: That is what it was, Your Honor.
4  That has not been fully briefed.
5       MR. ANDRE: They have not filed their oppositions
6  to that yet. It is based on the cases pending elsewhere and
7  the counterclaims elsewhere.
8       MR. ROVNER: Your Honor, there is one other issue
9  that is relevant to the, I don't want to say plaintiff or
10 defendants, because that's confusing in and of itself,
11 ViaCell, et al. With respect to their preliminary injunction
12 motion, we have responded to the notice of joinder that was
13 filed on October 28th by Mr. Rodgers' clients, CorCell and
14 Cryo-Cell. We believe that their joinder is improper for
15 many reasons. But that was briefed, we submitted our brief
16 last week on that.
17      THE COURT: I am aware of that. We can proceed
18 today and the Court can decide that at its leisure.
19      MR. ROVNER: I thought that that is what you
20 would say. However, the one thing is, I don't want to be
21 estopped later -- we obviously have nothing to say to CorCell
22 or Cryo-Cell to rebut any accusations or any allegations of
23 irreparable harm. They haven't presented any. So we don't
24 feel there is any basis for them to join in a motion which
25 is, you know, party-specific. So that's why we are not going

Page 185

1 either directly, contributorily or induce infringements of
2 the patents in each and every instance. Our legal theory, as
3 I am somewhat reluctant to continue spilling forward because
4 I think it does prejudice -- I am putting forward our legal
5 theory to these defendants early in the case.
6     THE COURT: That is the theory in your previous
7 argument today. I think you did indicate that that was the
8 theory.
9     MR. ANDRE: Our theory of the case was inducing
10 infringement. It is inducing infringement of a patent that
11 was not subject to this Court's previous preliminary
12 injunction that was filed on July 2nd.
13     THE COURT: Let me dial you back a bit just to
14 the early -- get you to respond to the observation by Mr.
15 Englander that the patents really, your patents, I mean other
16 than the '681 and '553, patents that are in suit in other
17 jurisdictions, really are before this Court within the
18 context of the antitrust complaint that's been filed by the
19 defendant. As evidence of that, Mr. Englander asserts and
20 advances this bit of evidence, the amnesty agreement itself,
21 I believe, which is at your Tab 5, which indeed does name the
22 '645, '427 and '275 patents. Why isn't that evidence that
23 underscores the correctness of his position -- I am not
24 saying whether he is right or not -- that tends to support
25 the view that in point of fact the Court, as I sit here

Page 186

1 today, as we sit here today, as the Court sits here today,
2 has jurisdiction over those matters?
3     MR. ANDRE: I think if this case were to stay in
4 this Court -- obviously, we filed a motion to dismiss on
5 those very grounds, because those patents are being asserted
6 against the defendants and against obstetricians elsewhere.
7 And in three of the instances, they have brought
8 counterclaims, CBR, who has not joined in on this antitrust
9 case, filed counterclaims against PharmaStem for these
10 various activities. CorCell did the same thing and Cryo-Cell
11 did the same thing as well.
12     ViaCell -- perhaps I am a bit too nice -- asked
13 for a 60-day extension. I granted it to them. And they
14 filed this action here and kind of came through the back door
15 on us. And Mr. Ware was very -- I give him credit for
16 getting a 60-day extension and having the Court weigh in on
17 this issue at this time.
18     That is the reason we are filing a motion to
19 dismiss and the reason we filed motions with the Court
20 saying, these are all within the same subject matter as the
21 case currently pending. We don't think they are ripe. If
22 you are going to file counterclaims, they should be with the
23 Court that is going to determine whether or not the
24 infringement, the infringement of these patents is going to
25 go forward or not.

Page 187

1     The possibility that would happen here is that
2 this Court could, in theory, say, well, I don't think
3 obstetricians are covered by the '427 patent, in the ViaCell
4 case. But we would be in a Boston court and could actually
5 prove they are covered. So we would have inconsistent
6 verdicts.
7     THE COURT: If there is a concern about
8 inconsistent results and inconsistent rulings, wouldn't it be
9 prudent, perhaps, to await the findings of the MDL, the
10 result of the MDL process in order to prevent just that
11 concern, which you express in your papers, the two concerns,
12 I think, inconsistency, and the Court certainly appreciates
13 your concern about the use of the Court's resources, that is
14 judicial economy, wouldn't it be prudent for all of us to
15 await that process, the completion of that process?
16     MR. ANDRE: I don't think I have much of an issue
17 of waiting to see how the MDL comes out. It is our position,
18 what is going on here is, by ViaCell filing this complaint
19 and CorCell and Cryo-Cell joining in in this particular case,
20 and bringing the patents that are mentioned in the amnesty
21 agreement before this Court in a way that is not really --
22 the Court is not here to determine whether or not these
23 obstetricians infringe --
24     THE COURT: I guess my point is, there has been a
25 complaint somewhere, I think, made by PharmaStem that the

Page 188

1 defendants are sort of stringing you out, that you only have
2 three and a half years left on the patents. And through the
3 vehicle of litigation, they are just prolonging things and
4 keeping you tied up, when in point of fact, it is PharmaStem
5 that has gone into other jurisdictions, and I am sure you had
6 very good reasons for doing that, but have filed additional
7 litigation, which you must have imagined when you filed it
8 was only going to further prolong your ability to engage in
9 the economic activity in which you seek to engage.
10     MR. ANDRE: Also, let me take a step back, about
11 these new lawsuits. While the posttrial motions were pending
12 on the '681 and '553, we had obviously sued on those a couple
13 years ago, we go through the full trial, we get the jury
14 verdict. Obviously, the Court has set aside the verdicts to
15 some degree. We also began at that time to contemplate going
16 after the healthcare providers, because the healthcare
17 providers, we believe there is a cognizable issue of
18 infringement here.
19     Now, we can't sue everyone in Delaware because we
20 just don't have jurisdiction. These are a lot of individual
21 physicians in LA. We can't get jurisdiction in Delaware.
22 What we did, we sued the healthcare providers that we
23 believed are infringing these patents, these additional
24 patents, not the ones before this Court.
25     THE COURT: Were any of the physicians on the

Page 193

1 certain facts, either for you or against you, relative to
2 these motions that are before me. Could I not? And should I
3 not? If not, why shouldn't I?
4     MR. ANDRE: I believe you should not, Your Honor,
5 because I believe that would be an advisory opinion as to the
6 infringement of these patents. At the end of the day -- you
7 know, at this time, the infringement cases are not before
8 this Court with those patents and with these defendants.
9 This Court is not familiar with -- to some degree you are
10 familiar, but you are not familiar with the claims we are
11 asserting. They are different claims. There are different
12 elements --
13     THE COURT: My goodness, Mr. Andre. We have the
14 identical specification and a similar specification in both
15 the patents already before the Court, already part of this
16 record. The claims, we can all read the claims. We all know
17 what the subject matter is. We don't have to beat around the
18 bush with that or play games. Mr. Ware -- I don't mean this
19 pejoratively - Mr. Ware used the term sophistry, we don't
20 have to engage in that type of legal sophistry, I will call
21 it advocacy, to be nice, in an effort to try to do what is
22 right. That is, try to achieve a just result in this case.
23 No? And in all the cases?
24     MR. ANDRE: Well, that is obviously our interest,
25 Your Honor.

Page 194

1     THE COURT: It's certainly the Court's interest.
2     MR. ANDRE: Absolutely. I think it's --
3     THE COURT: Although your interest is in
4 winning. I don't mean to denigrate that at all. As is the
5 defendants'. Okay? I don't mean to denigrate those
6 interests at all. They are perfectly honorable. But the
7 Court does have a different interest. That is where I am
8 trying to lead you. But go ahead.
9     MR. ANDRE: My point is, Your Honor, that the
10 property rights we have with the patents and how we choose to
11 assert them, and our reasons for doing so, is something that
12 is our prerogative and our rights.
13     THE COURT: I do agree with that.
14     MR. ANDRE: Whereas I understand the Court's
15 concerns about judicial resources and whatnot, there are
16 reasons why we would want to pursue the cases as they are
17 currently pending, because we are suing individuals. There
18 is everything from witnesses that we may be interested in
19 calling at trial with a trial subpoena that would not be --
20 if I am in LA, I am trying to get a witness in LA in a trial
21 subpoena, I doubt I could get him to come to Delaware.
22     There are reasons and strategic reasons which I
23 do not prefer to lay out at this point, just because I don't
24 want to tee off our hand too much to my opponents here, that
25 we would prefer to keep the cases pending where they are.

Page 195

1     THE COURT: For trial.
2     MR. ANDRE: For trial.
3     THE COURT: Perhaps you can answer this, and
4 others can weigh in. Is there anything that is inherent in
5 the MDL process that would preclude a plaintiff in your
6 position from applying to the panel and saying, judges, we
7 would like you to consider consolidating these lawsuits that
8 we have filed before this district court, wherever it is?
9     MR. ANDRE: Normally, that would be the case, a
10 plaintiff would go, because of the added expense. I am not
11 home at all now, traveling to Florida and Pennsylvania. That
12 is the reason I wasn't in Boston. Normally, it is the case
13 that plaintiff would go, because you look at the hardship on
14 the individuals.
15     Now, in this particular case of these defendants,
16 there is no hardship on them. They are in their back yard.
17 We sued them in their home town. That is where their lawyers
18 are located. It is something that there is no hardship on
19 them. So if we decide to suffer that hardship of having to
20 travel and whatnot, then that would be a decision we make.
21     We have not made a decision on the MDL at this
22 point. It was just filed recently. We are looking into it.
23 It is something we will make a decision and file our brief
24 with the MDL, I think we have 20 days from last week, we will
25 have it sometime mid-month, I believe.

Page 196

1     And my understanding of the MDL, it is
2 consolidated for all pretrial discovery and motion practice.
3     THE COURT: And you will be able to have your
4 trials where you could issue your trial subpoenas back in the
5 jurisdiction.
6     MR. ANDRE: Exactly. That is the reason we are
7 looking into it. It is something we are not intimately
8 familiar with because it happens so seldom in patent cases,
9 although it happens more and more.
10     THE COURT: Isn't the K-Dur case one?
11     MR. ANDRE: I have had one patent case where that
12 was the instance, where we did that. We are looking into it,
13 is my position.
14     Nonetheless, going back to the motion for
15 contempt, the documents that they complain of are all true in
16 fact. There is nothing false or misleading. There is
17 certainly nothing subjective that is false or misleading.
18     Exhibit 5 they point to, that is an absolutely
19 true statement. It is PharmaStem's position, as asserted in
20 these lawsuits, that obstetricians are liable for patent
21 infringement if they collect cord blood or market services
22 for unlicensed cord blood banks. That is an absolutely true
23 statement. That is the position that PharmaStem has taken.
24 There is nothing misleading about that. Nor are the other
25 mailings or press releases that went out, nothing false or

Page 249

1  damages while we are in reexam for almost seven years.
2        The fact of the matter is equitable intervening
3  rights is not a remedy available to them. No court has ever
4  held such.
5        Finally, regarding the hematopoietic
6  reconstitution, the patent says you have to have a sufficient
7  number of stem cells to effect hematopoietic reconstitution.
8  It doesn't mean you have to actually effect it. You have to
9  have a sufficient number of cells. The fact of the matter
10 is, unfortunately, small children who get transplanted with
11 ten times the cells they need do not achieve hematopoietic
12 reconstitution at the same time. There are a host of
13 factors -- Dr. Wagner testified to this, as well as other
14 experts -- that cause a patient to pass away beforehand. It
15 is unfortunate. But it's not because there is a lack of
16 cells or a lack of sufficient number of cells. It is because
17 they are terminally ill people that unfortunately, sometimes
18 the transplants just don't work. So it has nothing to do
19 with the sufficiency of it.
20       Then, we talk about the delay, you know, Your
21 Honor brought this up a little earlier, market share. For
22 this particular instance they say we have no market share,
23 for the antitrust, they say we do have market share. So it's
24 hard to define what exactly the market is here. We did not
25 say -- or if we did say it, I will correct it -- we have

Page 250

1  market share. We say our licensees had market share and they
2  are losing market share. That is an issue of harm.
3        More importantly is the statutory presumption
4  that we have a right to exclude people. It's time now. It's
5  time for these people to stop infringing and pony up -- if
6  they want to take a license, they had an opportunity to do
7  so. That day is gone now. We closed our licensing program
8  down. We sent letters saying we are going to close down
9  October 15. Come take a license now, you are going to have
10 the same license as the other 16 people did. Otherwise, our
11 board decided that we are not going to grant anymore
12 licenses.
13       We want an injunction. We sought an injunction
14 as soon as the facts changed in this case, in which
15 invalidity and enforceability were off the table, this Court
16 has only the issue of if these people infringe. We provided
17 enough evidence where a jury found all their units infringe.
18 We definitely provided enough evidence here today and in this
19 motion that at least some of them infringe.
20       Thank you, Your Honor.
21       THE COURT: Okay. The Court will take these
22 matters as well as the related motions under advisement. The
23 Court will issue a written opinion as soon as it is able.
24 And the Court thanks all counsel for your time and your
25 efforts.

Page 251

1        MR. ENGLANDER: Your Honor, two things we need
2  that were referenced. In addition, the client wanted us to
3  point out to the Court, with respect to the last motion, the
4  mere pendency of that motion is being used in the marketplace
5  against our client right now. So we wanted to point that
6  out. The client wants to emphasize that there is urgency
7  just getting the motion decided.
8        THE COURT: There are a lot of urgent matters
9  before the Court.
10       Okay. Thank you.
11       (Hearing concluded at 5:30 p.m.)
12            - - -
13 Reporter: Kevin Maurer