UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHARMASTEM THERAPEUTICS, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>VIACELL, INC., a Delaware corporation, OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A., FEMPARTNERS, INC., a Delaware corporation and CARITAS ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC., a Massachusetts Nonprofit Corporation,<br><br>        Defendants. | Civil Action No. 04-CV-11673 RWZ |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO ENJOIN VIACELL, INC. FROM TAKING FURTHER ACTION IN CIVIL ACTION NO. 04-1334-GMS IN THE DISTRICT OF DELAWARE**

Plaintiff PharmaStem Therapeutics, Inc. ("PharmaStem") submits this reply in support of its motion to enjoin ViaCell, Inc. ("ViaCell") from proceeding with its recently filed civil action *ViaCell, Inc., et al. v. PharmaStem Therapeutics, Inc.*, Civil Action No. 04-1335-GMS (D.Del.)("ViaCell's Delaware action"), *inter alia*, for pleading claims that are rightfully compulsory counterclaims to the above-captioned action in this Court, pursuant to Rule 13(a) of the Federal Rules of Civil Procedure.

**PRELIMINARY STATEMENT**

The issues underlying the current dispute are black and white. Are the claims asserted by ViaCell in its second-filed Delaware Action compulsory counterclaims in this action or not? The answer to that that question should be dispositive of the issue of which forum ViaCell should be pursuing its claims in. While PharmaStem here seeks to prohibit ViaCell from prosecuting a related litigation, that remedy in no way injures ViaCell because

ViaCell remains free to raise those causes of action in this Court. Indeed, PharmaStem awaits, with some curiosity, ViaCell's answer to the Complaint in this action, which is due on November 29, 2004.

## BACKGROUND

*PharmaStem's Pioneering Patents:*

PharmaStem is the owner of a family of cord blood banking patents, two of which are asserted in this action. In ViaCell's words, the "long history" of this case started with the issuance of the pioneering grandparent patent to the patents asserted in this case, U.S. Patent No. 5,004,681 B1 ("681 Patent"), to PharmaStem's predecessor-in-interest, BioCyte, Inc. ("BioCyte"). The patents asserted in *this* case, U.S. Patent Nos. 6,461,645 B1 ("'645 Patent") and 6,569,427 B1 ("'427 Patent"), did not issue until well after *PharmaStem v. ViaCell, et al.*, Civil Action No. 02-148-GMS (D.Del.) ("2002 Delaware action") commenced, almost three years ago.

PharmaStem f/k/a Biocyte, established in 1985, pioneered the field of cord blood therapy and the industry of cord blood banking. Its earliest competitors, ViaCell and Cryo-Cell International, Inc. ("Cryo-Cell"), did not come onto the scene until years later. For a relevant background of the parties' history, ViaCell's own Exerpts [sic] from Business Plan Draft, *circa* 1993/1994 (the "Business Plan"), is a veritable goldmine.[1] Indeed, even the timing of ViaCell's Business Plan, a document meant to woo investors, was prescient.

As the Business Plan documents, in or around 1993 (only two years after the '681 Patent originally issued) Cryo-Cell put the '681 Patent into reexamination. With the pioneer patent in reexam, ViaCell seized its chance to build an infringing business. On the financial front, ViaCell succeeded. While PharmaStem's pioneering patent would not reemerge from

---

[1] *See* Declaration of Edward W. Little, Jr. ("Little Decl."), Exh. 1, *passim*; *see also* Little Decl., Exh. 2 at 1448:2-1450:22 (ViaCell's Founder, Cynthia Fisher, authenticating contents of the ViaCell Business Plan as "provid[ing] full disclosure").

-3-

reexam until 2000, ViaCell has grown to become one of the nation's largest and most profitable private cord blood banks. In its '93/'94 Business Plan, ViaCell stated:

> Biocyte [n/k/a PharmaStem] has two patents on cord blood. They have patented the cryopreservation and therapeutic use of hematopoietic stem and progenitor cells derived from umbilical cord and placental blood. These patents are currently in reexamination by the U.S. Patent office… The patents they hold are broad and in question due to prior art in the field. They have been in reexamination since October, 1993. The patents are a known and acknowledged risks [sic]. The verdict will play a role in the outcome and success of this business opportunity.
>
> We view Biocyte as our strongest competitor. The founding scientists are core researchers in this field and have published many related articles. Biocyte's time, energies, and financial resources have been spent doing much education and development in this field. They are the trailblazers. Cross country skiing behind the trail blazer conserves energy and resources.[2]

Simply put, ViaCell has "cross country skied" behind PharmaStem, without a license to its cord blood banking intellectual property, for long enough. PharmaStem finds it difficult to believe that ViaCell, having once stated that PharmaStem's patents were "broad" and posed a "known and acknowledged" risk to ViaCell's business, now argues the exact opposite. PharmaStem's pioneering patent emerged from reexamination with its broad scope intact, validating the broad scope of its entire family of patents. Thus, ViaCell's collateral attacks on PharmaStem's enforcement efforts and marketplace activities in support of its patents are without merit.

*The 2002 Delaware Action and this Action:*

In the 2002 Delaware action, PharmaStem asserted the '681 Patent against defendant cord blood banks, including ViaCell. That action was tried to a jury, which found, *inter alia*, the '681 Patent, and another related patent, valid, enforceable, infringed, and willfully infringed. Importantly, the jury found that 100% of the

---

[2] *See* Declaration of Edward W. Little, Jr. ("Little Decl."), Exh. 1 at page 1.

defendants' stored cord blood units infringed. While the infringement judgment entered on the jury verdict was ultimately set aside in favor of a new trial on infringement – on *Daubert* grounds (excluding PharmaStem's infringement expert) – PharmaStem strongly believes that the underlying evidence is ample to prove that the vast majority (if not all) of the defendant cord blood banks' stored cord blood units infringe.

If the vast majority, if not all, of ViaCell's stored cord blood units infringe PharmaStem's patents, then clearly PharmaStem has a good faith basis to believe that anyone who provides ViaCell with cord blood is contributing (in a lay sense) to the infringement of PharmaStem's cord blood banking patents. Whether or not such contribution rises to the level of infringement conduct actionable under the laws is the issue before this Court. In this action, unlike the 2002 Delaware action, PharmaStem believes, among other things, that obstetricians or obstetrician groups are inducing the infringement of PharmaStem's patents. PharmaStem has come to this belief after preliminary investigation into the relationships between ViaCell and the obstetricians or obstetrician groups that collect cord blood for ViaCell, and direct potential customers to ViaCell (in some instances, upon information and belief, exclusively, *i.e.*, to the exclusion of PharmaStem's *licensed* cord blood banks, thereby, injuring them, as well).

***ViaCell's Delaware Action:***

In relevant part, ViaCell's Delaware Action complains that PharmaStem's Amnesty Agreements and settlement communications allegedly constitute wrongful efforts to effect a so-called "boycott" of private cord blood banks operating without a license from

PharmaStem.³ What ViaCell calls a "boycott," the Patent Laws call a patentee's statutory right to exclude. To be clear, some obstetricians and obstetrician groups have already settled with PharmaStem *per* the accused settlement communications. Thus, at the very least, any infringement notices, settlement offers or settlements in this action will clearly be part of the subject matter of ViaCell's Delaware Action. For that reason alone, ViaCell's Delaware Action concerns compulsory counterclaims to this action, which was filed first in time and already has put those actions at issue.

As ViaCell represents to this Court, its Delaware Action claims turn on the "overbreadth" of PharmaStem's Amnesty Agreements, settlement communications, infringement notices, and other marketplace activities in support of its patents. It is clear from the Amended Complaint in ViaCell's Delaware Action that such "overbreadth" depends on the very infringement issues in dispute in this action.⁴ For example, ViaCell generally alleges in the Delaware Action that there is no inducement of infringement, *because there is no direct infringement*, (Am. Compl. at ¶ 19); that "PharmaStem is attempting to achieve … the goal it is not entitled to achieve under it patents" (Am. Compl. at ¶ 25); and, that "[u]nder no proper interpretation of any claims of the PharmaStem Patents would an obstetrician be liable for patent infringement… PharmaStem does not hold a good faith belief that such conduct by physicians could provide a basis for infringement liability." (Am. Compl. at ¶42). Furthermore, ViaCell alleges that PharmaStem's *existing* licenses are "overbroad" (Am. Compl. at ¶ 44); that "[t]he terms of [the Amnesty Agreements] are far broader than is necessary to settle any legitimate claims for patent infringement PharmaStem may have against any hospitals or physicians" (Am. Compl. at ¶ 45); and, that "[n]one of PharmaStem's

---

³ *See* ViaCell's Opposition, Exh. B (Amended Complaint ("Am. Compl.") in ViaCell's Delaware Action) at ¶¶ 32-35.

⁴ *See* ViaCell's Opposition, Exh. B (Am. Compl.), *passim*.

patents could support such a broad and sweeping restriction on the activities of doctors" (Am. Compl. at ¶¶ 34-35). Thus, ViaCell's Delaware Action clearly and necessarily implicates the infringement questions already brought forward in this action, including any infringement notices, settlement offers or settlements made in this action.

*The Honorable Judge Sleet's Views:*

For some reason, ViaCell points to Judge Sleet's July 2 Order supposedly making "specific findings" that PharmaStem's marketplace activities in support of its patents are false and misleading.[5] However, even if the July 2 Order had any bearing, it was entered under highly unusual circumstances, leaving its status unstable and indeterminate. On June 30, 2004, ViaCell and others moved to restrain and enjoin PharmaStem's marketplace activities taken in support of its patents. For reasons unknown to PharmaStem, Judge Sleet signed and entered the proposed TRO and preliminary injunction, without modification, on July 2, 2004; only two days after the motions were filed and before PharmaStem had any opportunity to be heard, thus denying PharmaStem due process.

On August 4, 2004, ViaCell moved for contempt of the July 2 Order in connection with PharmaStem's Amnesty Agreement and other marketplace activities in support of its patents. Judge Sleet held a hearing on the contempt motion on August 6, 2004. At the August 6, 2004 hearing, Judge Sleet held "that it is my view at this stage of this discussion that PharmaStem is probably not in contempt of the Court's July 2 order."[6] Judge Sleet further held that "it would be, I think, prudent for the Court to consider this as a motion to amend the July 2 order rather than to find PharmaStem in contempt of that order."[7] Judge

---

[5] *See* ViaCell's Opposition, Exh. A (Letter to Judge Zobel, dated October 28, 2004) at 2-3 (describing "July 1 injunction" actually entered on July 2, 2004).

[6] *See* Little Decl., Exh. 3 at 25:15-19.

[7] *See* Little Decl., Exh. 3 at 25:20-24.

Sleet subsequently directed the parties to work out an informal resolution: "So I'm interested in knowing what, if anything, you can conceive among you that you can do about this release that will accommodate PharmaStem's right to announce, in good faith, the existence of lawsuits and its intent to protect its intellectual property rights while at the same time not interfering with this Court's process and interfering with the ability of potential customers out there, obstetricians and patients, to collect cord blood in an appropriate way."[8]  At the conclusion of the August 6, 2004 hearing, Judge Sleet reiterated, "[a]nd, again, I want to remind you… that I am not inclined to a finding of contempt under the circumstances…"[9] Thus, PharmaStem has never been held in contempt of any court order at any time.

On November 3, 2004, Judge Sleet held a hearing in connection with both ViaCell's Delaware Action and the 2002 Delaware Action regarding ViaCell's contempt motions and motions to enjoin PharmaStem's marketplace activities taken in support of its patents and PharmaStem's motion to enjoin ViaCell's and others' infringement of the '681 Patent during the pendency of the new trial on the extent of infringement of the '681 Patent.  At the conclusion of the November 3 hearing, Judge Sleet took all matters under advisement.

On the morning of November 15, 2004, Judge Sleet held a brief teleconference regarding MDL issues.  At the November 15 teleconference, Judge Sleet directed the parties to stipulate to a "standstill agreement" with respect to ViaCell's Delaware Action and ViaCell's repeated contempt motions in the 2002 Delaware Action, so he could direct his resources towards resolving pendant post-trial motions in the almost three-year-old 2002 Delaware Action.[10]  The clear upshot of the November 15 teleconference was that Judge Sleet and all parties would treat ViaCell's Delaware Action as potentially related to the MDL

---

[8] *See* Little Decl., Exh. 3 at 27:13-20.

[9] *See* Little Decl., Exh. 3 at 34:24-35:2.

[10] *See* Little Decl., Exh. 4, *passim*.

proceedings, but that the 2002 Delaware Action was separate and distinct for MDL purposes. The November 15 teleconference reinforces the close relation between ViaCell's Delaware Action and this action. Indeed, that close relationship is only further reinforced by ViaCell's MDL motion to consolidate this action with ViaCell's Delaware Action. At the same time, Judge Sleet has made it clear that the 2002 Delaware Action is unrelated to the other actions that ViaCell seeks to consolidate. Importantly, MDL does not deprive this Court of jurisdiction over ViaCell's compulsory counterclaims, nor suspend Rule 13(a) of the Federal Rules of Civil Procedure.

## ARGUMENT

**I.    THE CLAIMS IN VIACELL'S NEWLY-FILED DELAWARE ACTION ARE, WITHOUT EXCEPTION, COMPULSORY COUNTERCLAIMS TO THIS ACTION.**

**A.    ViaCell Is Trying To Hide Its Lanham Act, Statutory Massachusetts Unfair Competition, And Common Law Tort Claims Raised In ViaCell's Delaware Action.**

The most glaring and conspicuous omissions in ViaCell's opposition comprise the fact that ViaCell only discusses the antitrust claims it raised in the Delaware Action. What happened to its federal and state unfair competition claims under the Lanham Act and Massachusetts law that ViaCell has asked the Delaware court to decide?[11] What happened to its common law tortious interference with contract claims and tortious interference with prospective economic advantage claims?[12] Even if, as ViaCell claims, the *Mercoid* exception applied – which it does not (as discussed below) – ViaCell could not keep *all* of its compulsory counterclaims in the Delaware Action on the basis of an exception to its antitrust claims alone. ViaCell has already argued that all of its Delaware Action claims are

---

[11] *See* ViaCell's Opposition, Exh. B (Am. Compl.) at ¶¶ 113-126.

[12] *See* ViaCell's Opposition, Exh. B (Am. Compl.) at ¶¶ 127-140.

interrelated and concern the same subject matter. However, this is an argument that those claims should all be raised in this first-filed action here in Massachusetts, as opposed to being split up.

> B. **The *Mercoid* Exception Does Not Apply To ViaCell's Antitrust Claims.**

*Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661 (1944), although not overruled,[13] "has been widely and severely criticized, and most courts have narrowed it to its facts." *Rohm and Haas Co. v. Brotech Corp.*, 770 F.Supp. 928, 932 (D.Del. 1991). In support of *Mercoid*, ViaCell cites *Fowler v. Sponge Prod. Corp.*, 246 F.2d 223 (1st Cir. 1957), which commented on the *Mercoid* exception but only in *dicta*. But in *Rohm*, the Third Circuit (Roth, J.) stated that "[*Fowler*] [is itself] over thirty years old, and because [it] too ha[s] spawned few progeny, we do not view [it] as persuasive authority." 770 F. Supp. at 932. *Rohm*, which issued the above quotations, held that the *Mercoid* exception only applied to *Mercoid* factual analogs. *Id.*, at 934.

The species of patent misuse at issue in *Mercoid* involved conditioning, or "tying," the purchase of unpatented material to the grant of a license. "The contest [was] solely over *unpatented wares which go into the patented product*." *Mercoid*, 320 U.S. at 666 (emphasis added). ViaCell also cites *Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697 (2d Cir. 2000) and *Eon Labs., Inc. v. Smithkline Beecham Corp.*, 298 F.Supp.2d 175, 181 (D.Mass. 2003)(following Second Circuit's *Critical-Vac*, "the Court does not feel itself 'bound by *Fowler*'…"). However, *Critical-Vac* reconciled *Mercoid* with the purposes of Rule 13(a), holding that "[a]ntitrust claims based on patent misuse, such as the counterclaims in

---

[13] *Mercoid* was partially overruled by 35 U.S.C. § 271(d)(5)(no patent owner shall be deemed guilty of misuse or illegal extension of the patent right by reason of tying any rights to the patent to the acquisition of a license to rights in another patent or the purchase of a separate product, unless the patent owner has market power in the relevant market). *Cf.* 35 U.S.C. § 271, Historical and Revision Notes ("A patentee is not deemed to have misused his patent solely by reason of doing anything authorized by the section.").

*Mercoid*, are likely to involve factual issues distinct from those involved in patent infringement between the same parties." *Critical-Vac*, 233 F.3d at 703; *see also Eon Labs.*, 298 F.Supp.2d at 181 (same). "Indeed, this seems to have been true in *Mercoid*, as well, as the Supreme Court observed in that case, Mercoid's antitrust counterclaims involved *different* 'matters in issue or points controverted' from those involved in the earlier patent infringement litigation." *Critical-Vac*, at 703, quoting *Mercoid*, at 671. Accordingly, *Critical-Vac* and *Eon Labs* both held that second-filed antitrust claims based on patent misuse are compulsory counterclaims to the first-filed patent infringement action, where such antitrust claims "will generally involve the *same* factual issues as those involved in patent infringement litigation between the same parties…" See *Critical-Vac*, at 703 (emphasis in original); *Eon Labs.*, at 181 (internal citations omitted).

The present case is much more analogous to *Critical-Vac* and *Eon Labs.* than *Mercoid*. ViaCell's antitrust claims in its Delaware Action involve the *same* "matters in issue or points controverted" as in this action, including but not limited to, any infringement notices, settlement offers, and classic patent infringement questions such as the scope of the '645 and '427 Patents and whether or not the defendants infringe. Notably, as discussed above, ViaCell's antitrust claims also involve identical subject matter as its Lanham Act, statutory Massachusetts unfair competition, and common law tort claims in the Delaware Action, which are *prima facie* non-exempt from the compulsory counterclaim rule. Thus, *Mercoid* is not controlling.

Moreover, courts that have reached this specific question have held that antitrust claims identical to ViaCell's are compulsory counterclaims to the earlier-filed patent infringement action. For example, in *Schwarz Pharma, Inc. v. Teva Pharm., U.S.A.*, Civil Action No. 01-4995-DRD (D.N.J.)(pending), filed October 29, 2001, an analogous compulsory counterclaim question came before the Honorable Senior District Judge

Dickinson R. Debevoise.[14]  In that case, the plaintiff moved to strike portions of the defendant's antitrust counterclaims, contending that they were compulsory counterclaims to an earlier patent infringement action, in which they were not raised.  *See* Opinion at pages 2-4.[15]  The antitrust counterclaims at issue in *Schwarz Pharma* alleged violations of Sections 1 and 2 of the Sherman Act for illegal restraint of trade and illegal monopolization and attempted monopolization through pressing "suits that are a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *See id.*, at 3 (internal quotations and citations omitted).

Judge Debevoise noted that "[t]o prevail on a sham litigation claim, a claimant must show that the suit is 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits' and is subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy."  *See id.*, at 8, citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1072 (Fed. Cir. 1998).  Judge Debevoise held that the defendant's belatedly raised patent misuse antitrust counterclaim allegations "are directly related to and are dependent upon the merits of the issues in the [earlier-filed patent infringement] lawsuit."  *See id.* at 8-9.  Accordingly, Judge Debevoise ruled that such patent misuse antitrust allegations are compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure.

Similarly, the gravamen of ViaCell's Delaware Action is that the accused conduct is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and is subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy, identical to the gravamen of the

---

[14] *See* Little Decl., Exh. 5.

[15] Little Decl., Exh. 6.

-12-

defendant's belated counterclaims that were precluded in *Schwarz Pharma*. The fact that ViaCell foregoes the "sham litigation" claim against PharmaStem's litigations *per se*, just to plead the same statutory causes of action against PharmaStem for its infringement-related "sham" infringement notices, settlement offers, and settlements, cannot save ViaCell from the fact that its newly-filed claims are directly and logically related to the patent infringement action before this Court; arise from the same set of operational facts; and, encompass the same subject matter and legal, factual, and scientific questions. Thus, *all* of the claims raised in ViaCell's Delaware Action are compulsory counterclaims to this action. Finally, if this Court makes a compulsory counterclaim finding, then it does not matter which district court so finds or whether or not there is an MDL motion pending. One way or another, ViaCell must comply with Rule 13(a) of the Federal Rules of Civil Procedure, or be compelled to do so.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | PHARMASTEM THERAPEUTICS, INC.<br>By its attorneys, |
|  | /s/ Edward W. Little, Jr.<br>Daniel J. Kelly, BBO# 553926<br>dkelly@ghlaw.com<br>Edward W. Little, Jr., BBO# 628985<br>elittle@ghlaw.com<br>Gadsby Hannah LLP<br>225 Franklin Street<br>Boston, MA 02110 |
| DATED: November 22, 2004 | (617) 345-7000 |

OF COUNSEL:
PAUL J. ANDRE, Bar No. 196585
LISA KOBIALKA, Bar No. 191404
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, CA 94025-1114
Telephone: (650) 838-4300
Facsimile: (650) 838-4350

## CERTIFICATE OF SERVICE

I hereby certify that I have this 22nd day of November, 2004, caused to be served on all parties (or their counsel of record, if any at this time) the above document by hand delivery.

/s/ Edward W. Little, Jr.
Edward W. Little, Jr.